* * * * * * * * * * *
In accordance with the directives of the North Carolina Supreme Court, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer on the dates of plaintiff's injuries by accident of August 8, 1998 (injuries to both feet) and December 21, 1998 (back injury).
3. Defendants accepted liability for both the injuries by accident of August 8, 1998 (IC File No. 910380) and December 21, 1998 (IC File No. 919447), and have paid plaintiff temporary total disability compensation since December 21, 1998 in the amount of $154.91 per week.
4. The issues before the Commission initially were whether plaintiff is totally permanently disabled as a result of the cumulative injuries of August 8, 1998 and December 21, 1998, whether plaintiff is required to undergo any vocational rehabilitation, whether plaintiff is entitled to the treatment recommended by defendants' second opinion physician, Dr. Rowan, and whether plaintiff's adult son is entitled to compensation for the care he has provided to his mother since January 5, 1999. The only issue before the Commission upon remand is whether plaintiff is totally and permanently disabled.
 * * * * * * * * * * *
In accordance with the directives of the North Carolina Supreme Court, and based upon all of the competent, credible and convincing evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. As of the hearing before the Deputy Commissioner on March 21, 2000, plaintiff was 66 years of age. She graduated from high school and began working at age 18, doing office clerical work, typing and bookkeeping. Plaintiff worked in clerical positions until 1973 when she married and had a son, and then stayed home to be a full-time mother. Plaintiff has no computer skills or other office experience or training.
2. Plaintiff worked for about three months in 1994 as a cashier at Lowes Foods. She did not return to further employment until January 1996 when she began working at McDonald's making biscuits early in the morning. Plaintiff performed this job at McDonald's for about three weeks, until she hurt her back lifting a 50-pound bag of flour.
3. Plaintiff was diagnosed with a severe compression fracture at her T12 vertebral body, related to the lifting incident at work. She was treated by Dr. Charles Taft, an orthopaedic specialist, whom she first saw in March 1996. Plaintiff's x-rays showed osteoporosis and secondary kyphosis, a bowing of her back. Dr. Taft treated plaintiff with a three point brace, limited her lifting and took plaintiff out of work.
4. Plaintiff continued to wear the back brace for about a year, and her back healed and improved. As of August 23, 1996, Dr. Taft found plaintiff was at maximum medical improvement from the T12 compression fracture and rated her with a 15 percent permanent impairment to her back. Dr. Taft explained that a compression fracture might be painful for three to four months as it was healing and generally healed within six to eight months.
5. When he rated her on August 23, 1996, Dr. Taft cautioned plaintiff about not lifting over 15 to 20 pounds. In his office notes on plaintiff's return visit of October 25, 1996, Dr. Taft stated that he did not believe plaintiff would be able to return to gainful employment because he did not think she could sit or stand for periods of six to eight hours.
6. In spite of her osteoporosis, the compression fracture and Dr. Taft's concerns, in 1996 and 1997, plaintiff continued to live by herself in a one-bedroom apartment and performed her own cooking and cleaning. Eventually she recovered to the point that she could do most of the things she did before her back injury.
7. On July 16, 1998, plaintiff began working for defendant-employer as a door greeter. On August 26, 1998, plaintiff sustained injuries when another employee pulled a pallet jack over her feet. Plaintiff sought medical treatment at Prime Care on August 30, 1998, complaining primarily about her left foot. X-rays were taken of plaintiff's left foot at Prime Care. No fracture was shown and plaintiff was assessed with a contusion of the left foot. She was treated conservatively, told to use ice and elevate her foot, and was released to return to work with limited walking and standing.
8. On September 2, 1998, plaintiff returned to Prime Care for a follow-up visit. Although her left foot was still swollen and tender, plaintiff indicated she wanted to continue to work. There was no change in the assessment of a contusion of the left foot and plaintiff was released to light duty work. The medical notes reflect that a complete recovery was anticipated.
9. On September 27, 1998, plaintiff was seen at the emergency room of North Carolina Baptist Hospital with complaints of painful swollen feet. X-rays were taken of both feet and these showed no fractures. The final diagnosis of Dr. Ralph Leonard, the attending physician, was contusions of the ventral surfaces of both feet. Dr. Leonard gave plaintiff a work excuse, to return to work on September 29, 1998.
10. On September 29 and October 12, 1998, plaintiff reported to Prime Care with complaints of right foot and ankle pain. She was given a note for light duty work until October 28, 1998. When plaintiff was seen next on October 26, 1998, the Prime Care physician noted a diagnosis of "resolved plantar facitis" and released her to return to work without restrictions.
11. In November 1998, plaintiff returned to Prime Care complaining of pain in her right foot. Plaintiff was placed on light duty initially and then taken out of work from November 11 through November 20, 1998. A bone scan on November 10, 1998 showed abnormal uptake in the mid-thoracic and upper lumbar areas, as well as the third metatarsal of the left foot. Although this type of uptake is often associated with stress fractures, no acute fractures were apparent on the plain films. As a result of the bone scan, the treating physician noted a possible healing left foot fracture, that was previously undetected. As of November 20, 1998, plaintiff was released to return to work without restrictions.
12. On December 21, 1998, plaintiff was helping to straighten merchandise on store shelves. She was asked to move a sled that was used for displays during the holidays. The sled was on the top shelves and plaintiff had to use a ladder to get to it. When she moved the sled, plaintiff found that it was heavy and weighed over 20 pounds. As she moved the sled, plaintiff felt a sharp pain in her lower back.
13. Plaintiff went to Prime Care on December 26, 1998, seeking treatment for her back. She was initially taken out of work for two days. When plaintiff returned to the clinic with continued pain complaints on December 28, 1998, she was continued out of work through December 31, 1998. Although she was tentatively released to return to work with restrictions in early January 1999, on January 19, 1999 plaintiff was taken out of work pending an orthopaedic evaluation.
14. Plaintiff was referred back to Dr. Taft and saw him for her back complaints on March 24, 1999. Dr. Taft requested that plaintiff gather any recent x-rays for his review. At her next visit on April 1, 1999, Dr. Taft was first apprised of plaintiff's new injury of December 21, 1998. He assessed new compression fractures at L1 and L2, which were caused or aggravated by the incident of moving the sled on December 21, 1998.
15. Dr. Taft stated that the compression fractures should have healed within eight months, but the healing process has been slowed by the plaintiff's smoking habit of one pack per day, since smoking decreases the oxygen flow in the blood and slows the healing of the bone. Dr. Taft assigned a five percent disability rating to plaintiff's back for the new injuries, in addition to the 15 percent disability previously assigned for the 1996 back injury at McDonald's.
16. In assessing plaintiff's condition, Dr. Taft at his deposition stated his opinion that he did not believe plaintiff would be able to return to work. He testified: "And it appears to me that she is not going to be able to return to work at Wal-Mart. And I don't think that, with her osteoporosis and multiple compression fractures, that she is going to be able to return — to be gainfully employed." He continued to explain plaintiff's disability by stating that he did not feel that plaintiff could work because she could not stand or sit for periods of six or eight hours. Dr. Taft further felt that plaintiff was at a great risk of reinjuring herself if she returned to work, especially if the work involved lifting. Although Dr. Taft attributed plaintiff's inability to be gainfully employed primarily to her underlying osteoporosis, he also stated, and the Commission finds, that the compression fractures are a significant contributing factor to her disability.
17. Plaintiff was also examined by Dr. Frank J. Rowan, an orthopaedic specialist, whom defendants hired to conduct an independent medical examination. Dr. Rowan saw plaintiff on August 10, 1999. Dr. Rowan agreed with Dr. Taft's assessment. Both physicians testified that plaintiff had pre-existing osteoporosis, which made her more susceptible to compression fractures in her spine. The compression fractures at L1 and L2 were caused or significantly aggravated by plaintiff's accident of December 21, 1998.
18. Dr. Rowan also agreed with Dr. Taft's assessment that plaintiff's smoking interferes with the healing of the compression fractures. Dr. Rowan was emphatic that it was important for plaintiff to quit smoking. Although the compression fractures should have healed at the time of his examination, Dr. Rowan could not tell whether that was the case without a current bone scan, which he recommended. Dr. Rowan also recommended a functional capacity evaluation for plaintiff. His opinion was that plaintiff could do a seated job with frequent changes in position, no significant lifting or carrying or toting. Dr. Rowan did not believe that plaintiff was at maximum medical improvement, but assigned a five percent impairment rating for each compression fracture, once she reached MMI.
19. Both Dr. Taft and Dr. Rowan emphasized the importance of ongoing treatment of plaintiff's osteoporosis, which was a pre-existing condition that was not caused or aggravated by plaintiff's employment with defendant-employer. Ongoing medical treatment for plaintiff's osteoporosis was not necessitated by plaintiff's work-related injuries of August 8, 1998 or December 21, 1998.
20. Ongoing treatment for plaintiff's osteoporosis includes use of Fosamax or Miacalcin. Neither has a primary purpose of pain treatment, although there are indications that Miacalcin mitigates the pain of compression fractures secondary to osteoporosis. These medications aid in adding calcium to the bone and in preventing future compression fractures.
21. As both Dr. Taft and Dr. Rowan have testified, the primary limiting factor in plaintiff's ability to return to any type of employment is her osteoporosis, not the compression fractures. However, the compression fractures are also a significant contributing factor in plaintiff's disability, especially with regard to any pain that may be produced.
22. Plaintiff testified at the Deputy Commissioner's hearing that since December 21, 1998, her condition had worsened and that she was able to stand for only five minutes, could walk only very short distances, was unable to do any lifting, that her son did her grocery shopping, that she was unable to drive a car, and that she had lower back pain 24 hours, seven days a week.
23. Plaintiff's son, Robert Clark, Jr., left the Army and began living with plaintiff in January 1999. He testified that he believed plaintiff needed his help and could not live alone. He performs chores such as cleaning the house, doing dishes, driving plaintiff to the store and shopping; however, the evidence fails to show that such attendant care is medically necessary. Even if such ongoing care is needed, it is due to plaintiff's pre-existing osteoporosis and not the foot injuries or the compression fractures. Neither Dr. Taft, nor Dr. Rowan, nor any other treating physician has indicated that plaintiff is incapable of taking care of herself at this time. No physician has written orders for assistance or attendant care for plaintiff.
24. As a result of plaintiff's foot injuries of August 8, 1998, plaintiff sustained contusions and a possible fracture of her left third metatarsal. Dr. Taft concluded that plaintiff had no permanent impairment to her feet due to her injuries.
25. At the request of plaintiff's counsel, on November 17, 1999, plaintiff was examined by Dr. Stephen Shaffer of Southeastern Orthopedic Evaluation Centers, Inc., for an assessment of her impairment ratings to her feet. Dr. Shaffer found no swelling and a full range of motion. He assessed some possible arterial insufficiency, but did not indicate that this was related to plaintiff's foot injury. Dr. Shaffer assigned a five percent permanent impairment rating to each foot based on plaintiff's residual foot discomfort and possible aggravating effects on her bunions and status of her feet.
26. Based upon the assessments of both Dr. Taft and Dr. Shaffer, plaintiff has not sustained serious or debilitating permanent injuries to her feet. Dr. Taft found no permanent impairment and Dr. Shaffer's stated basis for his impairment rating is vague, and the ratings do not appear to be supported by any findings other than plaintiff's general complaints of discomfort. There is no evidence that plaintiff's prior foot injuries are now disabling or are a factor in whether she can return to gainful employment.
27. The Commission gives greater weight to the expert opinions of Dr. Taft, the treating physician, than to Dr. Rowan's opinions as to the extent of plaintiff's disability. Based upon the greater weight of the medical and other evidence, the Commission finds that as the result of the compensable injuries by accident plaintiff is incapable of earning the same or greater wages in any employment. Given plaintiff's age, lack of education and experience, and considering her other physical limitations, as well as plaintiff's own testimony regarding her limited ability to engage in everyday activities, plaintiff's pursuit of further employment opportunities or retraining are not reasonable or viable options.
 * * * * * * * * * * *
In accordance with the directives of the North Carolina Supreme Court, and based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On August 8, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer to both feet. Plaintiff has reached maximum medical improvement from these foot injuries, which are not a factor in any claim for ongoing total disability benefits. N.C. Gen. Stat. §§ 97-2(6), 97-29.
2. On December 21, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer to her back, including compression fractures at L1 and L2. N.C. Gen. Stat. § 97-2(6); Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 256 S.E.2d 389 (1980).
3. As the result of the work-related injury on December 21, 1998, plaintiff is incapable of work in any employment, and, therefore, she is totally and permanently disabled and is entitled to payment of permanent and total disability compensation benefits in the amount of $154.91 per week for the remainder of her life. N.C. Gen. Stat. § 97-29; Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982); Niple v.Seawell Realty Insurance Co., 88 N.C. App. 136, 362 S.E.2d 572
(1987), disc. review denied, 321 N.C. 744, 365 S.E.2d 908
(1988). Defendants have paid temporary total disability compensation to plaintiff since December 21, 1998 and shall continue payment of permanent total disability benefits for plaintiff's lifetime. Id.
4. Plaintiff is entitled to payment of all medical expenses incurred or to be incurred as a result of her foot injuries of August 8, 1998 and her back injury of December 21, 1998, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability. The medical treatment shall include medication which primarily treats the osteoporosis but also mitigates the pain associated with compression fractures, such as Miacalcin or Fosamax. N.C. Gen. Stat. §§97-2(19), 97-25. 5. Plaintiff is not entitled to reimbursement for attendant care services provided by her son. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 * * * * * * * * * * *
In accordance with the directives of the North Carolina Supreme Court, and based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall continue to pay plaintiff permanent and total disability benefits at the rate of $154.91 per week beginning December 21, 1998 and continuing for plaintiff's lifetime.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of her injuries by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability. Defendants are not responsible for treatment for plaintiff's osteoporosis, apart from medication that primarily treats the osteoporosis but also mitigates the pain associated with compression fractures, such as Miacalcin or Fosamax.
3. A reasonable attorney's fee of 25 percent of the compensation awarded to plaintiff in Paragraph 1 herein is approved for plaintiff's attorney. Hereafter, every fourth compensation check due to plaintiff shall be paid directly to her counsel.
4. Defendants shall pay the costs.
This the 26th day of April 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER